UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

 Plaintiff,

v.              CASE NO: 8:06-cr-26-T-26-TBM

MICHAEL ZAPETIS, KAREN CARAZO
ZAPETIS a/k/a KAREN LEICHT, et al.,

 Defendants.
            /

## O R D E R

Before the Court is Defendants Zapetis' Motion to Dismiss Count One of the Indictment on Grounds of Duplicity (Dkt. 422), and the Government's Response. (Dkt. 455). After careful consideration of the allegations of the indictment (Dkt. 1), the Court concludes that the indictment is not duplicitous and the motion should be denied.

### The Worthless CDs

Defendants Zapetis argue that count one of the two-count indictment is duplicitous[1] and must be dismissed. Specifically, they assert that count one improperly alleges two conspiracies— one fraud based on the use of the Solomon CDs in an asset

---

[1] "A duplicitous indictment charges two or more separate and distinct crimes in a single count." United States v. Burton, 871 F.2d 1566, 1573 (11th Cir. 1989). Duplicity is different from multiplicity, where an indictment charges a single offense in several counts. United States v. UCO Oil Co., 546 F.2d 833, 835 (9th Cir. 1976), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

rental scheme, and the other fraud based on the use of fraudulent guarantee bonds in a promissory note investment scheme. The Solomon CDs are worthless certificate of deposits issued by the International Trust Division of the Cooperativa De Ahorro Y Credito Gatun, R.L. (Cooperativa Gatun). Defendant Richard Solomon was the Executive Director of Cooperative Gatun. Mr. Solomon allegedly caused the preparation of the CDs, which were designed to conceal their fraudulent and worthless nature. The CDs constituted the statutory capital of the wholly owned subsidiaries of the sham insurance and reinsurance companies created as part of the conspiracy. The CDs were used to falsely inflate the consolidated balance sheets of the insurance and reinsurance companies so that the companies would appear to have the financial ability to pay on claims made. As part of the scheme, false financial statements and bogus audit opinions were created based on the CDs serving as statutory capital. The CDs made the issuance of insurance, reinsurance and financial guarantees worthless.

Defendants argue that count one alleges a "rimless wheel" conspiracy, which is a variation of the "hub-and-spoke" conspiracy. See United States v. Chandler, 388 F.3d 796, 807 (11th Cir. 2004). In the "hub-and-spoke" model, the central core of conspirators, which forms the hub, recruits different groups of co-conspirators, which form the spokes. "The core conspirators move from spoke to spoke, directing the functions of the conspiracy." Chandler, 388 F.2d at 807 (citing Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The "rimless wheel" model, however, occurs when the co-defendants making up the spokes have no connection with the other co-

defendants, other than the main conspirators' involvement in each transaction. Chandler, 388 F.3d at 808. No rim exists to connect the spokes and to tie the co-defendants together from "spoke to spoke." Id.

### **The Spokes of the Wheel**

The Solomon CDs were used in four of five "spokes" of the conspiracy under the rubric of overt acts. The first spoke involved American Indemnity Company, Ltd. (AIC), which was a Costa Rican sham insurance company with no statutory capital that was owned and controlled by the Zapetises and that issued worthless insurance policies. On various dates in late 1995 and throughout 1996, the conspirators began marketing AIC with the help of an insurance broker based on the supposed valid Solomon CDs and letters assuring the validity of the CDs.

The second spoke of the wheel involved Star Insurance Company (Star), which was a Costa Rican sham insurance company with no statutory capital that was owned and controlled by the Zapetises and that issued worthless insurance policies. On various dates in 1996, 1997, and 1998, the Zapetises, with the help of a certified public accountant in Costa Rica, caused to be issued a false audit opinion based on the consolidated financial statements of Star and its wholly-owned subsidiary, Capitales Tres de America, S.A. (Capitales Tres). Star was offered for sale by Karen Zapetis through First International Finance Corporation (FIFC), a company run by the Zapetises, to a co-conspirator. Defendants John Kramer, who was a Texas attorney and vice president of Star, Peter Greenhouse, who was a principal in GC Insurance Brokers, Ltd., in England, and Richard

Peterson, all either caused money to be wired to FIFC for the purchase of Star or committed acts holding Star out as a viable insurance company. Although Defendants in this motion acknowledge that there is no specific mention of the asset rental scheme in connection with Star, the description of Star refers to its having "no statutory capital" and "falsely and fraudulently" inflating its financial statements. They agree that these references could connect the CDs and the use of rental assets with Star in connection with the overt acts.

The third spoke dealt with Global Insurance Company, Ltd. (Global), which was a Costa Rican sham insurance company with no statutory capital that was created by the Zapetises and that issued phony financial guarantee bonds to guarantee repayment of promissory notes. On various dates in 1997, 1998, and 1999, the Zapetises, with the help of a certified public accountant in Costa Rica, caused to be issued a false audit opinion based on the consolidated financial statements of Global and its wholly-owned subsidiary, Capitales Nueve de America, S.A. (Capitales Nueve). Stock of Global was offered for sale to Defendant Clifton Lees. A large amount of the worthless Solomon CDs were deposited into an account of Capitales Nueve in exchange for monthly asset rental payments from Capitales Nueve.

The fourth spoke gave rise to the creation of Continental Indemnity, Ltd. (CI Ltd.), a company from Barbados that was formed as part of an undercover operation by the Internal Revenue Service. CI Ltd. was established by conspirators to facilitate the issuance of fraudulent insurance and to send the proceeds of illegal activity offshore. On

various dates in 1997, 1998, and 1999, Defendant Anthony Hicks met with undercover government agents in order to establish CI Ltd. Defendant William Clancy also met with undercover agents and agreed to prepare an unqualified audit opinion of the financial statements of the offshore company. Clancy also sent documents to the agents relating to Synergy Capital Management (Synergy), Financial Capital Company of America (FCCA), the subsidiary of Synergy, and Inversiones Solidarias Americanis, S.A. (Inversiones). Kramer and Michael Zapetis also met with agents regarding the rental of assets. Kramer, an attorney, used his trust account to receive payments for the rental of assets. Finally, Hicks sent the agents a phony $3,000,000.00 insurance policy.

The Solomon CDs were not used in the fifth spoke of the conspiracy. The fifth spoke involved Synergy and FCCA. On various dates in 1997, 1998, 2000, and 2001, Defendant William Broughton caused fraudulent FCCA financial guarantee bonds to be sent to victim-investors in Premier Holidays. Defendant William Clancy issued false audit opinions based on the financial statements of FCCA and also sent "lulling" letters to the victims after the money was obtained.

## The Rim of the Wheel

Defendants Zapetis argue that there is no overlap of the first four spokes with the fifth spoke because there are no overt acts with regard to Synergy/FCCA involving the Solomon CDs or the use of asset rental. In support of their argument, they note that the paragraphs addressing the descriptions of the entities of Synergy and FCCA do not

mention the Solomon CDs.[2] The Government, however, shows the overlap with the fifth spoke. As long as the same basic mode of operation was used in connection with each spoke, it is not necessary to demonstrate that the method of conducting the conspiracy was exactly the same in each instance. In other words, the CDs need not be the same device used to inflate the financial status of the sham insurance companies in every instance. See United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (noting that the essence of conspiracy is the existence of the agreement).

Although Defendants' position is that count one is duplicitous, they concede four of the five spokes are "rimmed." Notwithstanding this concession, they contend that there are two distinct conspiracies as opposed to one. Thus, from the outset, under the Defendants' theory the wheel has a rim around four-fifths of its circumference. Under the rationale of Chandler, the "rimless" wheel contains autonomous spokes—any one spoke operates without any knowledge of any other spoke. Defendants concede that the four spokes involving the worthless Solomon CDs constitute one broad conspiracy. Hence, they recognize that many of the co-conspirators cross paths with some but not all of the spokes and there is some modicum of interdependence among the spokes.

Their distinction based on the absence of CDs in the fifth spoke involving Synergy, however, misses the mark in the single broad conspiracy alleged in the indictment. As the Government explains, the individuals and entities that conspire along

---

[2] See docket 1 at paras. 17 & 18.

each spoke often jump from spoke to spoke reminiscent of individuals "getting on and off a train." The main or "hub" conspirators, Defendants Zapetis, remain on the train, or remain at the hub, and operate the criminal scheme along the train's track, the rimmed wheel, to its destination. The absence of the use of worthless CDs in every single spoke of the conspiracy is not fatal. The use of the fraudulent guarantee bonds or the CDs to inflate the financial statements of the companies is part of the one broad conspiracy to sell bogus insurance products as part of an investment scheme. The device by which the insurance company or its products is falsely portrayed need not be the same from spoke to spoke or transaction to transaction. The crux of a conspiracy is the agreement to commit an unlawful act, which was to sell insurance products through the use of false, inflated financial statements. The method of the inflation need not be the same from spoke to spoke. Just as "separate transactions are not separate conspiracies" when the conduct or method is aimed at a common objective, whether the CDs or the guarantee bonds were used is not crucial as long as they the spokes carry out the same objective. See United States v. Powell, 982 F.2d 1422, 1431 (10th Cir. 1992).

It is therefore **ORDERED AND ADJUDGED** that Defendants Zapetis' Motion to Dismiss Count One of the Indictment on Grounds of Duplicity (Dkt. 422) is **DENIED.**

**DONE AND ORDERED** at Tampa, Florida, on March 11, 2010.

s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record